## GRACE ATKINSON v. AMERICAN SCHOOL OF OSTEOPATHY and CHARLES E. STILL, Appellants.

### Division One, February 29, 1912.

1. **NEGLIGENCE: Malpractice: Sufficiency of Evidence.** The plaintiff seeks damages for alleged malpractice in giving her osteopathic treatment in 1902. She was then a student in defendant school, and defendant Still acted as the agent of the school in treating her. The plaintiff testified that Still, in the course of the treatment, crushed her sternum by pushing upon it with his knee; that there was no special pain that day; it hurt a little, and the third day it pained so that she turned sick and had to leave the class; that she

then had to go to bed and had stabbing pains all the time for two or three days and then grew better, so that she went about her affairs for two or three years. Before bringing this suit she had become a confirmed asthmatic and greatly reduced in flesh. There was, also, a deformity of the thorax, her condition was incurable, and she had become incapable of practicing her profession, all, she alleged, the result of the malpractice. *Held*, that there was ample evidence for the consideration of the jury.

2. INSTRUCTIONS: Negligence: Malpractice: Nature and Extent of Duty Assumed. The plaintiff alleges that defendant Still, an osteopath, while acting as agent for his codefendant school and treating plaintiff, negligently injured her by pushing with his knee against her chest. An instruction—which is in that respect like all those given for plaintiff—says: "And if you further believe that such treatment was improper and not such as an ordinary skilful and careful man would have given the plaintiff under the circumstances, then you will find the defendant's treatment of plaintiff by the said Chas. E. Still as the agent and servant and employee, was careless and negligent and unskilful." This instruction ignores the fact that the plaintiff submitted to the treatment furnished by the defendant school knowing that it was to be osteopathic; and that treatment according to this system was contemplated in her contract; and it gave the jury the right to find that osteopathic treatment was not proper treatment, and that persons administering it were not ordinarily skilful and careful; while the law is that her treatment must be judged by the osteopathic method. The conduct to be observed in order to fill the requirements of ordinary care should have been specified in the instruction. And the fault is not cured by defendant's first instruction, which says that if the "plaintiff when she entered the defendant's school was afflicted with asthma" and Doctor Still in treating her therefor "adopted the usual osteopathic method of treating asthma, and used ordinary care and skill, . . . then plaintiff cannot recover." That instruction applies only in the event that plaintiff had asthma when she entered the school, which is a contested averment. In this case, however, the plaintiff's instructions of the kind in question are saved by the fact that defendant Still and the dean of the faculty of defendant school testified that the application, in the position described in the evidence, of such force as to fracture or dislocate the parts involved would be improper practice.

3. EVIDENCE: Res Gestae: Statements of Agent. The plaintiff was permitted, over the defendants' objection, to testify that Doctor Laughlin, the osteopath who, at the instance of the defendants, treated her after the date of the alleged injury for the ailments from which she was then suffering, told her

that the second, third and fourth ribs were broken, *caused by Doctor Still's treatments*. The cause of her condition was the real question in issue. *Held*, that the admission of that evidence was reversible error. True, Doctor Laughlin was the agent of defendants to treat the plaintiff, but he was not their agent to talk about past occurrences. His remarks concerning the cause of plaintiff's injury were not part of the *res gestae*.

Appeal from Putnam Circuit Court.—*Hon. George W. Wanamaker*, Judge.

REVERSED AND REMANDED.

*Campbell & Ellison, N. A. Franklin, C. E. Murrell* and *Higbee & Mills* for appellants.

(1) The court erred in permitting plaintiff to testify over defendants' objection that Doctor Laughlin told her that her ribs were broken, caused by Doctor Charley Still's treatment. This was hearsay and opinion. (2) The court erred in refusing defendants' instruction 1, in the nature of a demurrer to the evidence at the close of all the testimony. 1. The evidence relied on to prove that plaintiff sustained the fracture charged, has no probative value, is in conflict with the physical facts as testified to by plaintiff, and at war with common sense and human experience. Courts will take judicial notice that the fracture of a bone will cause instant pain. 7 Ency. Ev., 909; 1 Elliott, Ev., sec. 39, p. 39, note 16, p. 37; Payne v. Railroad, 136 Mo. 562; 4 Elliott on Railroads (2 Ed.), sec. 1703, p. 787; Phippin v. Railroad, 196 Mo. 321. 2. There was no evidence by any person competent to speak upon that subject, tending to prove that plaintiff's afflictions are a natural result of, or were caused by, the alleged injuries. Moore v. Railroad, 226 Mo. 689.

*G. C. Weatherby, John D. Smoot, J. C. McKinley* and *C. C. Fogle* for respondent.

(1) Where the evidence introduced by the respective parties is conflicting and of a substantial nature, the findings of the trial court or jury will not be disturbed by the appellate court. Sparks v. Jasper County, 213 Mo. 218; Liese v. Meyer, 143 Mo. 547; Sayre v. Trustees of Princeton, 192 Mo. 95; Franklin v. Railroad, 188 Mo. 533; Feary v. Railroad, 162 Mo. 75; Hamburger v. Rinkel, 164 Mo. 398; Phelps v. Zinc Co., 218 Mo. 572. (2) Defendants' first instruction admits the truth of all plaintiff's material evidence and all reasonable inferences therefrom. Puck v. The Company, 159 Mo. 468; Young v. Webster, 150 Mo. 333; Holman v. Mining Co., 102 Mo. App. 423. (3) Plaintiff's instruction according to the allegations of her petition and the evidence given at the trial declare the law of the case. Granger v. Still, 187 Mo. 213; Robertson v. Wenger, 131 Mo. App. 224. (4) Let us examine the points in appellant's brief based upon the hearsay rule. Dr. Geo. Laughlin was a member of the faculty—dean of the college. He was therefore agent of the defendant school. Further, plaintiff was entitled to free treatment after the payment of her tuition. It therefore became Doctor Laughlin's duty, as agent of the defendant school, to treat plaintiff. Defendant Still was also a member of the faculty and an agent of the defendant school. Now defendant Still sent Doctor Laughlin to treat plaintiff. Hence Doctor Laughlin became the agent of the defendant Still. Therefore, at the time Doctor Laughlin made the statements complained of above, he was the agent of both defendants. This being true, then upon the authority of Phillips v. Railroad, 211 Mo. 419, l. c. 441, his statements are admissible as against both defendants. (5) The defendants complain that the court should have given an instruction defining the term "ordinary care." And yet defendants' instruction 1 used the

term "ordinary care" without defining it. The rule is that a party is not at liberty to complain of an instruction on the part of his adversary, where his own exhibits the same fault. Quirk v. St. Louis, etc. Co., 126 Mo. 279; Lewis v. Humphries, 64 Mo. App. 466; Christian v. Ins. Co., 143 Mo. 460; Grocery Co. v. Smith, 74 Mo. App. 419.

BROWN, C.—This is a suit by which the plaintiff seeks to recover from the defendants damages for malpractice in treating her for disease by the method or system commonly known as osteopathy. She recovered judgment in the amount of ten thousand dollars, from which this appeal is taken by the defendants. The suit was instituted April 17, 1906.

The amended petition on which the cause was tried states in substance that the defendant the American School of Osteopathy is a corporation; that it owns a large amount of real estate in Kirksville, Adair county, Missouri; that it conducts a school whereby it teaches the science of osteopathy, with a regularly organized faculty of teachers who are practitioners of the science, and whose duty it is to treat the students during their attendance at the school without charge; that the defendant Still was a member and president of said faculty, duly authorized to practice said profession and that it was in the line of his duty to treat the students; that plaintiff entered the school as a student about October 1, 1901, paid her tuition in full, and thereby became entitled to instruction and treatment, and afterwards graduated therefrom and became entitled to practice osteopathy. It then proceeds in the following words: "That at the time plaintiff so entered said school she discovered that she had a slight affection of the nasal passages that slightly affected her breathing; that on or about said date defendant Charles E. Still made an examination of her case while she was then a stu-

dent in said school, and as such physician and sur-
geon undertook to treat her· said complaint and as-
sured her that he would really relieve her thereof;
that plaintiff submitted to his said treatment and de-
fendant Charles E. Still thereupon began to treat her
therefor and continued to treat her therefor until the
— day of April, 1902, when ·defendant Charles E.
Still so carelessly, negligently and unskilfully treated
and manipulated plaintiff's body in so treating her for
said maladies that he negligently and carelessly broke
and crushed plaintiff's sternum, commonly known, the
breastbone, and forced the same in and upon her lungs
and bulged and forced out the cartilages of her ribs
on the right side of ·her body into an unnatural posi-
tion; that as a direct result of said unskilful neglect
and careless treatment and of the injury so inflicted
upon her, she became sick and affected and has ever
since suffered with asthma, uterine and rectal trou-
bles, loss of flesh, and suffered much bodily and men-
tal pain, and her general health has been permanently
injured and she has been incapacitated from practic-
ing her said profession, or to earn her livelihood.''

Defendant Still answered,. admitting that he was
an osteopathic physician; that plaintiff began the
study of osteopathy in 1901 and before that time was
afflicted with asthma; that she graduated, and became
a doctor of osteopathy in June, 1903; and that during
the time she was a student he treated her osteopathi-
cally several times, and always with his best skill and
ability; and denied all other allegations of the peti-
tion.

The defendant corporation answered with a gen-
eral denial.

No question is made, either in the pleadings or
evidence, as to the skill and learning of the defendant
Doctor Charles E. Still in his profession of osteopathy.
The following facts developed in the evidence are ad-
mitted and accepted by all parties to the controversy:

The plaintiff was a trained nurse, about twenty-nine years old at the time of the alleged injury, whose home was at Brantford, Ontario, with her mother and brother. About the first of October, 1901, she went from Buffalo, New York, where she was professionally employed, to Kirksville, Missouri, and was matriculated as a student of osteopathy in the school of the defendant corporation, paying a fee of three hundred dollars for the course, which entitled her to free osteopathic treatment by members of the faculty, who were doctors of osteopathy duly qualified for the practice. She was suffering at the time from some ailment or weakness for which she desired treatment and became the patient of the defendant Doctor Charles Still, a son of Doctor A. T. Still, the president and founder of the school, and himself the vice-president. He treated her during this school year, which closed in June, 1902. She went home that summer, returned to Kirksville in time for the term beginning in September, 1902, engaged in athletic sports to some extent that fall and the next spring, and graduated in June, 1903. Her brother was matriculated as a student of osteopathy at the same school in the fall of 1902, and graduated in June, 1904. In September of that year she began the practice of her profession in Albia, Iowa, where she stayed eight or nine months, at the end of which time she had become unable to practice. Before the bringing of this suit she had become a confirmed asthmatic, and was greatly reduced in flesh. At the time of her matriculation in the Kirksville school she weighed from one hundred to one hundred and two pounds, and at the time of the trial eighty-three pounds. She has a distinct deformity of the thorax, consisting of an abnormal position of the breastbone and ribs which constitute the bony structure of its walls. Her condition seems to be considered incurable.

It is a theory of osteopathy that most diseases are caused by some displacement or abnormality of the bones, and the treatment consists largely of manipulation to correct this condition. In treating asthma and other diseases affecting the chest the spine is manipulated to establish motion between the ribs and the vertebrae, and the ribs are sprung to establish better articulation with the spinal column, all portions of which are felt to detect what is wrong. In doing this it is customary to place the knee against the breastbone to immobilize the thorax, and then to press forward on the backbone and posterior ends of the ribs. This is called the knee treatment, and students are especially cautioned to use it carefully to prevent injury, and both the defendant Doctor Still, and Doctor Laughlin, dean of the faculty of the defendant school, testified that the application in this position of such force as to fracture or dislocate the parts involved would be improper practice.

As to matters in dispute: The plaintiff testifies that when she came to Kirksville she had been working on a hard case, was nervously run down and had a little whistle in her nose. The defendant Doctor Still treated her from a short time after her arrival until April, 1902, when she claims to have received the injury complained of under circumstances which she describes in her testimony as follows:

"He came in the room and he said. 'Good morning, Miss Atkinson, how are you this morning?' I said, 'Dr. Charley, you are not doing me a bit of good. I am getting worse.' He said, 'I will take that out of you or I will break your neck,' and with that he put his knee against the breastbone and by putting his arm around the back he pulled with his hand and pushed with his knee, and drew me forward like that, and I said, 'Dr. Charley, you crushed my sternum in the breastbone.' He said, 'I guess not.' I said, 'You did, I know you did,' and he said, 'Oh, I guess not.' I said,

'Well, I know you did,' and he went around to the back and felt the condition, and he said, 'I guess you will come out all right, I didn't realize you were so small. I have just been treating a two-hundred-pound woman, and didn't realize the weight I was putting on you.' ''

She said that she just felt the bone crush; that there was no special pain that day; it hurt a little and the third day it pained her so bad that she turned sick and had to leave the class. She then had to go to bed and had stabbing pains all the time for two or three days and then got better. In the fall of 1902 she had her first attack of asthma, and it grew worse and worse. She suffered much pain around the ribs, which stood out prominently on the right side, and her breastbone was sunken. She said that as a consequence of this injury she also had female, bowel and kidney troubles, and an abscess on the lung. She also says that at the time she went to Kirksville and applied for treatment she thought that the wheezing in her nose was asthmatic, and "supposed perhaps asthma might have been coming on." Her father and one sister had had asthma. As to the condition of the parts affected after the time stated by her as the date of the injury, she introduced much testimony of expert osteopathists, graduates of the defendant school, who testified that they had then examined her; that some of her ribs were dislocated and the cartilages fractured; that her breastbone was fractured or out of place; that the injuries would probably be produced by such violence as that described by her in her testimony, and that the asthma and other difficulties from which she suffered would probably be the result of these injuries. She also introduced evidence of admissions made by defendant Still, one of them being a statement said to have been made in a lecture delivered in the school by defendant Still, as a member of the faculty, cautioning his class against the appli-

cation of the "knee treatment," to the effect that he
met with an accident like that, in which he had broken
the ribs and sternum of that "Atkinson girl."

On the other hand, all violence and injury is de-
nied by evidence introduced by defendants, which
tends strongly to prove that the plaintiff was afflicted
with asthma when she came to Kirksville in 1901, that
it had progressed until she had become a comfirmed
asthmatic, and that the physical deformities and dis-
eases which she ascribes to the injury alleged in the
petition, are the natural effects of that disease. They
also introduced expert testimony to show that the
necessary and immediate result of such an injury as
she claims to have received would have been much more
serious than that which is admitted by her to have fol-
lowed it.

The plaintiff having been introduced as a witness
in her own behalf, the following question, referring
to Doctor George Laughlin, was asked her by her
counsel: "After Doctor Charley had sent George to
treat you after the time spoken of in 'the last ques-
tion, and while he was so treating you—I believe that
was in 1902—what other statements, if any, did he
make as to the condition he found you in, *and the cause
of your affliction.*" The defendants duly objected to
this question, and, after overruling the objection, to
which action the defendants excepted, the court said
to the witness: "In answering this question confine
yourself to the statement made while he was in the
official treatment of you." The objection was then
renewed and overruled, to which exception was saved,
and the witness answered: "He said that the sec-
ond, third and fourth ribs were broken, *caused* from
Doctor Charley's treatment." She was then asked:
"He knew of the treatment Doctor Charley had given
you?" and answered: "Yes, sir." Then, upon ob-
jection of defendants the court said: "Strike out that
'he knew.' "

At the close of the evidence the defendants asked the court to peremptorily instruct the jury to find in their favor, which the court refused to do and the defendants duly excepted. It then requested four other instructions numbered from two to five inclusive, in substance as follows: (2) That the jury must not permit sympathy for plaintiff to influence their verdict. (3) That if they should find from the evidence that defendant Still, while treating plaintiff, fractured the sternum, and bulged or forced out the cartilage of the second, third and fourth ribs, yet that fact alone does not prove or tend to prove that such treatment was either negligent or unskilful. (4) That if they should find from the evidence that the plaintiff had asthma when she entered the school, she should not recover.

The court refused each and all these instructions, to which action the defendants saved their exceptions.

The court then, at the instance of the plaintiff, gave the jury six instructions, the first of which is in words and figures following:

"No. 1. You are instructed in this case that the plaintiff sues the defendant, the American School of Osteopathy and Chas. E. Still, claiming in her petition that Chas. E. Still was the agent and representative of the defendant school of osteopathy and as such representative and agent was employed by her to treat her for an ailment; and she further claims that in treating her for said ailment he carelessly and negligently pressed his knee against her sternum near the gladiolus and put his hands behind her and pulling with his hands and pressing with his knee, crushed, depressed or fractured said gladiolus and fractured the cartilage of the second, third and fourth ribs between the end of the rib and the sternum, and that by reason of said treatment she suffered great pain and anguish of mind; now, if you believe and find from the greater weight of the evidence that the said defendant was

the agent and servant of the American School of Osteopathy, and that in treating the plaintiff he did carelessly and negligently press his knee in her sternum near the gladiolus, and his hands behind her back and pulling and pressing with the knee with such force that it did produce a fracture or depression of the gladiolus and a fracture of the second, third and fourth ribs or the cartilage thereof, and that said treatment was negligently and carelessly administered by the defendant and was improper treatment of plaintiff; and if you further believe that she suffered pain by reason of said treatment, then your finding should be for the plaintiff and you should assess to her such damages as you may believe and find will compensate her for said suffering and pain not exceeding the sum limited in these instructions.''

The second, after describing the treatment complained of practically as in the first, told the jury that if they believed ''this treatment was carelessly and negligently administered and was not such treatment as is properly and ordinarily administered in such cases, and . . . that plaintiff by reason of such treatment suffered great pain, and . . . asthma resulted, from which she has since suffered, and become unable to do any labor or perform any services, . . . and . . . became incurable by reason of such treatment,'' their finding should be for plaintiff.

In number three the jury were told that if, in such treatment, defendant Still carelessly, negligently and unskilfully ''did hurt, bruise and injure plaintiff in and upon her sternum and the ribs attached to the sternum, the verdict must be for the plaintiff.''

The fourth directed them that if such treatment was improper, and not such as an ordinarily skilful and careful man would have given the plaintiff under the circumstances, they should find for the plaintiff.

The fifth directs that if defendant, in the treatment of plaintiff ''negligently and carelessly pressed

his knee against her sternum and hands behind her, and negligently and carelessly used such force by pressing and pulling plaintiff that he fractured the sternum and crushed it in upon her chest and fractured ribs, and by reason of such treatment she became permanently injured, lamed and suffered great pain," the jury should find for the plaintiff.

In the plaintiff's sixth instruction the elements of damage submitted arising from the same injury consisted solely of "pain and anguish of both body and mind."

For the defendant the court instructed the jury as follows:

"1. If you find and believe from all the evidence that plaintiff, when she entered the defendant school, was afflicted with asthma, and that thereafter the defendant, Chas. E. Still, treated her for that disease, and in so treating her adopted the usual osteopathic method of treating asthma, and used ordinary care and skill in treating her, then plaintiff cannot recover and your verdict must be for the defendants, regardless of any other fact or issue in the case.

"2. Although a person who is being treated by a physician may grow worse, or even if the patient dies under his care, yet such fact of itself alone furnishes no evidence that such physician was guilty of either negligence or unskilfulness."

I. The plaintiff makes no complaint, either in her petition or the proceedings at the trial, that the defendant Still did not possess the qualifications required by the provisions of article 4 of chapter 126, Revised Statutes 1899, with reference to osteopathy, or that he did not possess the requisite skill for the treatment of diseases by the methods prescribed by that system. She simply claims that in the exercise of that profession he treated her so carelessly, negli-

gently and unskilfully as to produce the injuries of which she complains. Nor do the defendants question the assertion that the defendant Still treated the plaintiff as the agent and employee of his codefendant the American School of Osteopathy, so that corporation would be jointly liable with him for damages resulting from any such negligence. They do contend, however, that in this case there is no substantial evidence that Still was negligent in his treatment of the plaintiff, or that she suffered any injury or damage on account of it, and that for that reason the trial court should have directed a verdict for them.

They say "that the history of her alleged injury is incredible and impossible, both from a physical and psychological standpoint," and explain that "if she had suffered bone fractures, instant and severe pain and prostration would have followed, as certainly as fire will burn, or water run downhill." The inference seems to be that her assertion that after suffering these injuries, and a few days-of confinement and pain therefrom, she so far recovered as to pursue her studies and engage in sports for more than six months before the serious phases of the injury developed, is contrary to some well known and universally recognized natural law, like the force by which we may assume that water will run downhill, or to universal human experience from which also we are permitted to assume that fire will burn.

We fail, however, to appreciate the application of that argument to the evidence in this case. Many of us have not had the fortune to sustain similar fractures and cannot therefore speak from personal experience, but we have learned by observation as well as common information that apparently similar lesions of the human tissues produce widely different results, even in cases exposed to the most casual visual observation, and in cases of internal injuries we are prepared to receive the evidence of those skilled in

observing such things as to their nature and probable results, as well as the testimony of those who have seen or experienced the effects which have actually followed them. Considered from this standpoint there is no lack of evidence for the consideration of a jury, of the injuries charged in the petition, and no error was committed by the trial court in refusing to withdraw it from their consideration.

II. The defendants also complain of the instructions upon which the case was submitted for the plaintiff, because, they say, the question of negligence in the treatment of plaintiff was submitted to the jury in general terms without any explanation of the nature and extent of the duty assumed by defendants in relation to said treatment for the neglect of which the plaintiff might recover. This point may be illustrated by quoting from the fourth instruction given for the plaintiff as follows:

"And if you further believe that such treatment was improper and not such as an ordinary skilful and careful man would have given the plaintiff under the circumstances, then you will find the defendant's treatment of plaintiff by the said Chas. E. Still as the agent and servant and employee, was careless and negligent and unskilful." This instruction, as well as all the other instructions given for her, ignores the fact that the plaintiff submitted to the treatment furnished by the defendant school knowing that it was to be applied according to the system known as osteopathy, and that treatment according to this system was contemplated in her contract, and gave the jury the right to find that osteopathic treatment was not proper treatment, and that persons administering it were not ordinarily skilful and careful; while the law is that her treatment must be judged by this method. [Grainger v. Still, 187 Mo. 197; Patten v. Wiggin, 51 Me. 594; Force v. Gregory, 63 Conn. 167.]

The merit of the system which the plaintiff had deliberately chosen was placed on trial by these instructions and the jury was plainly authorized to find a verdict in her favor on the ground of her own mistake in choosing unwisely. Our statute, already referred to (R. S. 1899, secs. 8537-8539), expressly recognizes osteopathy as "a system, method or science of treating disease of the human body," and the defendant's school as the exponent of its method and practice. It also expressly authorizes persons having diplomas from that or any other legally chartered and regularly conducted school of osteopathy to treat diseases of the human body according to such method. In so doing it necessarily permits and authorizes persons to contract for such treatment. It is true that section 8537 provides that osteopathy is "not to be the practice of medicine and surgery within the meaning of article 1 of this chapter, and not subject to the provisions of said article;" but the purpose so expressed is simply to segregate this particular system from those for the regulation of which article 1 was enacted.

All these systems, methods or sciences are directed to the treating of diseases of the human body, and each stands upon the merits of its own system. This is evidently one of those "cases in which the conduct to be observed in order to fill the requirements of ordinary care should be specified in the instruction." [Nephler v. Woodward, 200 Mo. 179, 187; Hayden v. Railroad, 124 Mo. 566; Dairy Co. v. Transit Co., 98 Mo. App. 20.]

It is suggested by the plaintiff that the error embodied in these instructions is cured by the first instruction given for the defendants, which tells the jury that if the "plaintiff when she entered the defendant's school was afflicted with asthma, and that thereafter the defendant Charles E. Still treated her for that disease, and in so treating her adopted the usual osteo-

pathic method of treating asthma, and used ordinary care and skill in treating her, then plaintiff cannot recover.'' This instruction it will be observed only applies in the event that when the plaintiff entered defendant's school she had asthma, and is confined in its scope to the treatment of asthma alone, so that the plaintiff's contention cannot be sustained unless we assume the truth of one of the most strongly contested averments in the defendants' case, which we are not at liberty to do.

A more plausible defense of these instructions is made upon the testimony of both the defendant Doctor Still, and Doctor Laughlin, dean of the faculty of the defendant  school, to the effect that the application, in the position described in the evidence, of such force as to fracture or dislocate the parts involved would be improper practice. The plaintiff contends, with much reason, that this testimony being undisputed left nothing to be determined by the jury except the simple question whether or not such injuries were produced in the manner described, and eliminated all question of negligence from the issue. The jury necessarily passed upon this simple question of fact, and it is insisted that their verdict ought not to be disturbed because it was submitted in connection with others not necessary to be considered by them. Under these circumstances we think that the objection made to these instructions is a purely technical one, not affecting the real merits of the controversy. The fact, however, that the trial was, in its principal features, a juratory contest over the existence of the facts asserted by plaintiff as the foundation of her suit, emphasizes the importance of the duty of the court to see that it was fairly conducted, in accordance with the rules prescribed by law for ascertaining the truth. This leads us to the consideration of the most important question in the case.

III. The plaintiff was permitted, against the objection of the defendants properly made, to testify on the trial that Doctor Laughlin, the osteopath who, at the instance of the defendants, treated her after the date of the alleged injury for the ailments from which she was then suffering, told her that her second, third and fourth ribs were broken, *caused from Doctor Still's treatments*. The cause of her condition was the real question in issue. In its bearing upon the question, the evidence complained of was of the utmost importance and might well have turned the scale in favor of the plaintiff when weighed with the mass of conflicting statements before the jury.

The question is one of importance, because, if such testimony is admissible, it opens one more door by which verdicts may be recovered upon unsworn gossip instead of sworn testimony, and makes it dangerous to furnish the first surgical aid to injured employees, which, happily, most employers are glad to render. This evidence was admitted on the ground that the doctor was the agent of the defendants in the treatment of the plaintiff, and if his statement as to the cause of the injury was made during this treatment it was, by reason of its concurrence in point of time, a part of the *res gestae;* ignoring entirely that the *res* was not the treatment being administered by Laughlin, but the treatments that had long before been administered by Still, to which the words "caused from Doctor Charley's treatment" could alone apply.

In support of her position in this respect the plaintiff relies on Phillips v. Railroad, 211 Mo. 419. In that case the witness was the chief surgeon of the defendant railroad company, the question was the mental condition of a man in his charge, and the evidence was his official report on that very question, made in the performance of his official duty, and was therefore properly held to be the statement of the company by its general officer charged with the duty, and

therefore, the authority, to make it. It has no appli-
cation to this case, in which Dr. Laughlin was not em-
ployed by defendant to talk of past occurrences, but
only to treat the patient. In doing this (not *while*
doing it) he had authority to act and speak for his
principal.

Any fact material to the interest of either party
to an action, which rests in the knowledge of another,
is to be proved by his testimony and not by his mere
assertion, unless the party has authorized him to make
the assertion. This doctrine was well stated by Mr.
Justice KENNEDY in Hannay v. Stewart, 6 Watts, 487,
489, as follows:

"The statements of an agent, generally, though
made of the business of his principal, are not to be tak-
en as equivalent to the admissions of the principal,
for then the latter would be bound by them, whether
true or false, which would render the situation of ev-
ery principal truly perilous. Every man has a right
to make such representations of what he has done as
he pleases, and to bind himself to abide by them,
whether true or otherwise; and they of course may be
given in evidence against him afterwards, when rele-
vant to the issue trying; not, however, because the
facts therein stated are true, but because he has the
right to pledge himself in the same manner as if they
were true; and if true, justice naturally requires that
he should be bound by them, or if not, it is no more
than the infliction of a just penalty for his disregard
of truth. But it would not be reasonable to hold him
responsible upon the same principle for the declara-
tions of his agent; nor upon any principle, except that
of truth and the protection of those against loss or
injury, that might otherwise arise from their having
confided in the representations of the agent, made by
him at the time of entering into the agreement, or of
transacting the business, under the authority of his
principal. According to Mr. Phillips, in his Treatise

on Evidence, vol. 1, page 77, it is only the statements or representations of the agent made in effecting an agreement or doing an act within the scope of his authority, that are evidence against his principal and considered equivalent to his own acknowledgments; because, as he says, they may be explanatory of the agreement, or determine the quality of the act which they accompany, and, therefore, must be binding on the principal, as the act of agreement itself.''

This same reasoning is epitomized by this court in McDermott v. Railroad, 73 Mo. 516, 519, as follows: ''The declarations of an agent are received, not as admissions, but as a part of the *res gestae.* . . . Only declarations, therefore, made by the agent while transacting business within the scope of his agency, and then only because a part of the *res gestae,* are admissible.'' No pair of words in our legal terminology are more carelessly used than these words *''res gestae.''* In applying them to the subject we are now considering, we should bear in mind that they refer to the thing done by the agent, and that words to be a part of the *res gestae* must be used in furtherance of the doing of that thing. This court, in Price v. Thornton, 10 Mo. 135, 140, put the doctrine in a nutshell. In speaking of the admissions of a ship-master against the owners, it said: ''They are bound for the actual conduct of Captain White; not for what he might say he had done.'' In this case it is sought to bind the defendants by the unsworn statement of Doctor Laughlin as to what one of them—not he—had done long before. To hold that this can be done would be a long step toward depriving litigants of whatever protection there may be in the sanctity of the oath and the influence of legal pains and penalties for perjury.

The opinion already expressed renders it unnecessary to notice any of the numerous other errors assigned by the appellants in their brief.

For the reason stated the judgment of the circuit court is reversed and the cause remanded for a new trial. *Bond, C.,* concurs.

PER CURIAM.—The foregoing opinion of BROWN, C., is hereby adopted as the opinion of the court. All the judges concur.